FILED

APR 1 4 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

S-TRONIX,

        Plaintiff,

                                    CV 08-272-PK

                                    OPINION AND

v.                                    ORDER

SUBMEDIA, LLC,

        Defendant.
_____

PAPAK, Magistrate Judge:

      This action was filed against defendant/counter-claimant Submedia, LLC, by

plaintiff/counter-defendant S-Tronix on March 4, 2008.  S-Tronix' complaint raised a single

claim for breach of contract.  On April 2, 2008, Submedia answered S-Tronix' complaint and

filed a counterclaim, likewise for breach of contract.  On November 3, 2008, the parties filed

cross-motions for summary judgment, and on January 21, 2009, this court decided each motion

Page 1 - OPINION AND ORDER

and entered judgment in S-Tronix' favor. The court's jurisdiction over this action is pursuant to

28 U.S.C. § 1332, based on the diversity of the parties' citizenship.

Now before the court is Submedia's motion (#43) to alter or amend the court's judgment.

I have considered the motion, oral argument on behalf of the parties, and all of the pleadings on

file. For the reasons set forth below, the motion is denied.

## LEGAL STANDARD

"Under [Federal Civil Procedure] Rule 59(e), it is appropriate to alter or amend a

judgment if (1) the district court is presented with newly discovered evidence, (2) the district

court committed clear error or made an initial decision that was manifestly unjust, or (3) there is

an intervening change in controlling law." *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,

555 F.3d 772, 780 (9th Cir. 2009) (internal quotation marks omitted), *quoting Zimmerman v.*

*City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). Whether or not to amend a judgment

pursuant to Rule 59(e) is within the district court's discretion. *See, e.g., Carroll v. Nakatani*, 342

F.3d 934, 940 (9th Cir. 2003). Amendment pursuant to Rule 59(e) constitutes "an extraordinary

remedy, to be used sparingly in the interests of finality and conservation of judicial resources."

*Id.* at 945 (internal quotation marks omitted), *quoting* 12 James Wm. Moore et al., Moore's

Federal Practice § 59.30[4] (3d ed. 2000).

Here, because Submedia does not allege the existence of newly discovered evidence or a

change in controlling law, the applicable standard is that of Rule 59(e)(2), pursuant to which

amendment is appropriate in the event of clear error or manifest injustice. *See* Fed. R. Civ. P.

59(e)(2).

## FACTUAL BACKGROUND

### I.    Formation of the Contract Underlying the Parties' Dispute

On June 28, 2005, S-Tronix entered into a Technology Purchase Agreement (the "TPA")

with In-Focus Corporation, pursuant to which S-Tronix agreed to sell, and In-Focus agreed to

purchase, certain software and other technology (collectively, the "Technology") designed to

permit companies to display advertisements on digital screens located on the campuses of

participating colleges and universities.  The TPA further provided that S-Tronix would not

"develop[,] market or otherwise produce a product or technology that competes, directly or

indirectly, with the Technology" during the effective period of the agreement.  The TPA obliged

In-Focus to pay S-Tronix $200,000 by July 1, 2005, $10,000 monthly from July 2005 through

June 2006, $13,333 monthly from July 2006 through June 2007, and $16,666 monthly from July

2007 through June 2008.  The agreement specified that In-Focus would be required to make these

payments "as long as there has been no breach" of the TPA.

### II.    The s-tronix.com Website

At the time In-Focus purchased the Technology from S-Tronix, a demonstration version

of the Technology identified as "Wallvue"[1] was visible to the public on the internet on a website

located at http://s-tronix.com.  With the sale of the Technology to In-Focus, control over the

server that hosted the s-tronix.com website (the "website") passed to In-Focus and/or to a

subdivision thereof called "The University Network" or "TUN."

---

[1] The record contains affirmative evidence suggesting that the product referred to on the
s-tronix.com website as "Wallvue" is the same product referred to herein as the Technology, and
not a different iteration thereof or a separate, discrete product of any kind.  The record contains
no evidence to the contrary, although it does contain evidence that Submedia was unfamiliar with
the appellation "Wallvue" until approximately November 2007.

On August 28, 2006, Bill Taylor, a TUN information technology worker, wrote an email message to John Deranian, a website developer associated with S-Tronix, advising him that "We have changed the root password on the servers [hosting the s-tronix.com website]." Taylor added, "If you would like to know what [the new password is], please call me." The evidentiary record is silent as to whether Deranian ever subsequently requested the new password of Taylor or of any other In-Focus/TUN employee, and as to whether Deranian ever actually learned the new password, either in response to such inquiry or otherwise.

**III.    The s-tronix.com Website is Made Visible on the Internet at S-Tronix' Request**

At some date following the sale of the Technology to In-Focus, the s-tronix.com website was made unavailable for viewing by the public on the internet. On November 6, 2006, at a time when In-Focus was making efforts to sell certain of its assets, including the Technology, S-Tronix CEO Spencer Roberts wrote to TUN information technology worker David Grantham to advise him that the website was not visible on the internet, and asked why that was the case. Within minutes, Grantham replied, "You can now get back to your site, Spence," suggesting that he had caused the website once again to be visible to the public on the internet.

It is Roberts' testimony that he was motivated to ensure that the website would be available for public viewing on the internet in order to facilitate In-Focus' efforts to find a purchaser for the Technology. Specifically, Roberts testified that he wanted to assist prospective purchasers in performing due diligence as to the value of the Technology by demonstrating the Wallvue application hosted on the s-tronix.com website. Submedia disputes the truthfulness of Roberts' testimony as to his motivation for contacting In-Focus regarding the website's absence from the internet, contending to the contrary that Roberts intended to use the website to market a

product competitive with the Technology.

## IV.    Transfer of Contract Rights to Submedia

On November 30, 2006, In-Focus' rights and obligations under the TPA were assigned to defendant Submedia. In-Focus was in compliance with all of its obligations under the TPA at the time the transfer was effected.

## V.    Submedia's Failure to Comply with its Contractual Obligations

It is undisputed that at some time either immediately or shortly following the assignment of rights in the Technology to Submedia, Submedia began failing to make monthly payments as provided in the TPA. From time to time, Submedia tendered partial payments, but it does not appear that Submedia ever brought its account with S-Tronix fully up to date. Submedia last made an installment payment to S-Tronix in or around August 2007. According to evidence in the record, Submedia failed to pay a total of $186,659 in periodic payments due to S-Tronix under the payment provisions of the TPA.

## VI.    Web Developer Seeks Access to Files Stored on the s-tronix.com Website

On January 30, 2007, William Cavataio, the web developer who originally authored all or much of the content on the s-tronix.com website, contacted Roberts by email to advise him that Cavataio was unable to access the website via FTP. Cavataio indicated that he wanted to access certain files stored on the website's server, but that he was unable to do so because the password had changed. On January 31, 2007, Roberts replied by email, copying his reply to Grantham of TUN, stating "will see if [D]avid [Grantham] can give ya the word../location.." The record contains no evidence as to whether Grantham subsequently supplied Cavataio with a password that would permit him to access files on the server via FTP, whether Cavataio subsequently

obtained such a password in any other manner, or whether Cavataio thereafter actually accessed

files on the server via FTP or otherwise.

## VII.   Submedia Learns that the s-tronix.com Website is Visible to the Public on the Internet

In November 2007, it came to the attention of Submedia CEO Peter Corrigan that the s-

tronix.com website – including the Wallvue application – was visible to the public on the

internet.  It is Corrigan's testimony that he viewed the historical versions of the website stored at

the internet archive site archive.org and noticed that unspecified "changes" to the website were

recorded there.  Corrigan testified that he "believed" some of these changes occurred in 2007.  He

further testified that he had no personal knowledge as to who might have effected the changes to

the website.

At some time in or shortly following November 2007, Submedia apparently adopted the

position that the presence on the internet of the website and the Wallvue product constituted

breach of S-Tronix' contractual covenant not to "develop[,] market or otherwise produce a

product or technology that competes, directly or indirectly, with the Technology."  However, it is

Roberts' testimony that S-Tronix never received any inquiry from any prospective purchaser of

the Wallvue product at any material time, either through the s-tronix.com website or otherwise,

and that S-Tronix never sold nor attempted to sell any product competitive with the Technology

to any prospective purchaser following the initial sale of the Technology to In-Focus.

## VIII.   S-Tronix' CEO Discusses the Issue of Access to the Server Hosting the s-tronix.com Website

On December 7, 2007, Roberts engaged in a dialogue with Deranian via email in which

Roberts appeared to ask Deranian for evidence that he was unable to access files stored on the

server hosting the s-tronix.com website. Although the attachments and internet links referenced in the email colloquy are not contained in the evidentiary record, it appears from the text of the email messages that Deranian may have captured screenshots of an unsuccessful effort to log in to the hosting server and made these available for Roberts to view. Subsequently, on December 8, 2007, Deranian forwarded to Roberts the email message of August 28, 2006, in which Taylor informed Deranian that the server password had been changed. To this, Deranian appended the text, "effectively, this is when I lost access to the servers."

## IX.    This Action

S-Tronix filed this action March 4, 2008, alleging Submedia's breach of its payment obligations under the TPA. On April 2, 2008, Submedia filed its counterclaim for breach of contract, taking the position that its conceded nonperformance of its payment obligations, which began in or around December 2006, was excused by S-Tronix' alleged breach of its noncompetition obligations, which, according to Corrigan's testimony, Submedia became aware of in November 2007. On November 3, 2008, the parties filed cross-motions for summary judgment. On January 21, 2009, this court decided the parties' cross-motions for summary judgment in favor of plaintiff S-Tronix, ruling that Submedia was in breach of the TPA by failing to make payments required thereunder, and that S-Tronix had not breached its contractual obligations to Submedia. Now before the court is Submedia's motion to alter or amend the judgment entered against it to deny S-Tronix' motion for summary judgment.

## ANALYSIS

Submedia argues that this court committed clear legal error by failing to construe evidence in the light most favorable to Submedia in deciding S-Tronix' motion for summary

Page 7 - OPINION AND ORDER

judgment. Specifically, Submedia identifies four factual determinations that it argues were necessarily erroneous in light of the applicable legal standard: (i) that after June 28, 2005, the s-tronix.com website was under the exclusive control of either In-Focus Corporation or defendant Submedia (as opposed to being under the exclusive or concurrent control of S-Tronix or its agents); (ii) that in or around November 2006 S-Tronix CEO Spencer Roberts requested that In-Focus make the s-tronix.com website available for public access on the internet in order to assist In-Focus in its efforts to sell the Technology to a third party (as opposed to having a different motivation for making the request), (iii) that In-Focus began looking to sell the Technology in or around November 2006 (as opposed to an earlier date), and (iv) that the record contains evidence that, following the June 28, 2005, date of S-Tronix' sale to In-Focus of rights in the Technology, the Technology was never offered for sale on the s-tronix.com website, and that the record contains no evidence that S-Tronix sought to market the Technology on the s-tronix.com website following that date.

Submedia argues both that the foregoing findings could not have been reached by a reasonable factfinder if the evidence in the record, and all reasonable inferences therefrom, were construed in the light most favorable to Submedia, and that each finding was material to the court's ultimate ruling on S-Tronix' motion for summary judgment. Submedia does not now contest the court's decision as to Submedia's own motion for summary judgment, as to which the court was required to construe the evidence in the record in the light most favorable to S-Tronix.

I.  **Exclusive Control of the S-Tronix Website**

A.  **Relevant Findings**

The court made each of the following findings of fact in its Opinion and Order of January

21, 2009 (the "Opinion"):

> According to the evidence in the record, in or around November 2006 In-Focus
> began "looking to sell" certain of its assets, including the Technology. Some of
> the prospective purchasers of the Technology, including defendant Submedia,
> made inquiries regarding S-Tronix as components of their due diligence
> investigations. Because these due diligence inquiries were occurring, Spencer
> Roberts, the CEO of plaintiff S-Tronix, requested of an In-Focus corporate officer
> that In-Focus make the S-Tronix website – **which was at that time hosted on a
> server under In-Focus' exclusive control** – visible to the public on the Internet,
> so that a demonstration version of the Technology accessible through that website
> could be shown to candidate purchasers.

Opinion, 3-4 (emphasis supplied).

> [Following November 30, 2006, the date In-Focus' rights under the TPA were
> assigned to Submedia], the system administrator with authority to exercise control
> over the server that hosted the S-Tronix website was at all material times a
> Submedia employee.

Opinion, 4.

> As noted above, at this time the server hosting the S-Tronix website was under
> Submedia's exclusive control.

Opinion, 4, n. 1.

> The evidence in the record establishes clearly that **at all times following the sale
> of the Technology to In-Focus in June 2005, the S-Tronix website was under
> the exclusive control of either In-Focus or its successor in interest, Submedia.**
> After June 2005, no S-Tronix employee ever had system administrator privileges
> for that website.

Opinion, 6 (emphasis supplied).

> [I]t was not S-Tronix which made the promotional materials available on the
> internet [in or around November 2006], but rather Submedia's predecessor in

Page 9 - OPINION AND ORDER

> interest [In-Focus], and it was not S-Tronix but rather Submedia that thereafter
> had the authority, ability, and incentive to make the materials unavailable again.

Opinion, 7.

### B.     Discussion

Submedia acknowledges that the record contains affirmative evidence -- chiefly the sworn

testimony of S-Tronix CEO Spencer Roberts -- that following the sale of the Technology to In-

Focus, S-Tronix never had the ability to log on to the server that hosted the s-tronix.com website.

However, Submedia argues that evidence in the record gives rise to reasonable inferences that

create a material question of fact as to the credibility of Roberts' testimony.  Specifically,

Submedia asserts that evidence in the record "conclusively demonstrates" that at material times

S-Tronix had "extensive control" (emphasis original) over the s-tronix.com website and that S-

Tronix "continuously obtained access" to it.  In support, Submedia directs the court's attention to

(i) the email message of August 28, 2006, from Taylor to Deranian, in which Taylor advised

Deranian to request the new password to the website server if he wanted to know it, (ii) the

Grantham-Roberts colloquy of November 6, 2006, in connection with which Grantham made the

s-tronix.com website visible to the public on the internet, (iii) the Cavataio-Roberts colloquy of

January 30 and 31, 2007, in which Roberts forwarded to Grantham Cavataio's request for access

to files stored on the server hosting the website, (iv) Corrigan's testimony that the website had

been modified, and that the modifications, by whomever effected, might have been made in

2007, and (v) the Deranian-Roberts communications of December 7 and 8, 2007, in which

Roberts asked Deranian to provide evidence of his inability to log on to the server hosting the s-

tronix.com website.  Interpreting this evidence in the light most favorable to Submedia, the

court's finding that at all material times it was either Submedia or its predecessor in interest, and not S-Tronix, that had exclusive control over the server hosting the s-tronix.com website was not clearly erroneous, and therefore should not be disturbed.

The August 28, 2006, email from Taylor to Deranian establishes that In-Focus/TUN advised Deranian to ask for the new root password to the website's server if he wanted it. While this fact is compatible with the proposition that Deranian subsequently requested the password and used it to access the server, it does not reasonably give rise to the necessarily serial inferences that he in fact did subsequently request the password, that In-Focus/TUN or Submedia provided it to him, and that he thereafter did access the server for an improper purpose. It is well established that "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-1082 (9th Cir. 1996) (citations omitted); *see also, e.g., Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (in the absence of evidence that the defendant's agents actually read the plaintiff inmate's mail, evidence that the agents had the opportunity to do so and allegations that they did so were insufficient to create a material factual dispute where the record contained the defendant's affidavit that the agents did not do so). Moreover, in evaluating a motion for summary judgment, "[a]lthough the evidence must be viewed in a light most favorable to the opponent of the motion, and all reasonable inferences must be drawn in [it]s favor, the inferences are limited to those upon which a reasonable jury might return a verdict." *United States ex rel. Anderson v. Northern Telecom*, 52 F.3d 810, 815 (9th Cir. 1995), *citing T.W. Elec. Svc., Inc. v.*

*Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630-31 (9th Cir. 1987). A reasonable trier of fact could not reasonably infer from the August 28, 2006, email message from Tyler to Deranian that Roberts' testimony was untruthful.

Similarly, the November 6, 2006, Grantham-Roberts colloquy does not give rise to the inference that S-Tronix had the ability to modify or access documents stored on the host server at any material time. It may reasonably be inferred from the colloquy that, at Roberts' request, Grantham took steps to ensure that the s-tronix.com website was visible to the public on the internet. It is not, however, reasonable to infer that, in addition, Grantham provided Roberts with a password that would have given him root access to the server that hosted the website. Indeed, the fact that Roberts needed to ask a TUN employee to make the website available for public viewing on the internet, rather than suggesting the implausibility of Roberts' testimony that Submedia's control of the server was at all material times exclusive, suggests, to the contrary, that, at least as of November 6, 2006, S-Tronix lacked the ability to access the server without In-Focus' intervention.

The Cavataio-Roberts communications likewise do not give rise to the inference that S-Tronix had the ability to access the host server during the effective period of the TPA. The gravamen of the communications is, again, that as of January 31, 2007, S-Tronix lacked the ability to give Cavataio FTP access to files stored on the server without Submedia's intervention. Moreover, in the absence of any scintilla of evidence that any Submedia employee actually provided Cavataio with a working password or other means of accessing the server remotely, it cannot reasonably be inferred from the communications that Cavataio subsequently obtained root access to the server and shared such access with S-Tronix.

Page 12 - OPINION AND ORDER

Corrigan's testimony is also insufficient to give rise to the inference that Roberts' testimony was in any way untruthful. Corrigan testified only that he "believed" that archive.org's records showed that the s-tronix.com website was modified, and that the modification might have taken place in 2007. Corrigan expressly conceded that he lacked personal knowledge as to who might have effected the modification. Because it would be pure speculation to conclude based on such testimony that the website was in fact changed, that the change took place in 2007, and that it was S-Tronix that effected the change, a trier of fact could not reasonably infer therefrom that, despite Roberts' contrary testimony, S-Tronix had access to the hosting server.

Finally, the Deranian-Roberts communications of December 2007 do not support any inference one way or the other as to the veracity of Roberts' testimony that the hosting server was at all material times under Submedia's exclusive control. In these communications, Roberts asked Deranian for evidence that he was unable to log on to the host server, and Deranian purported to comply. This exchange provides no support for Submedia's position that, to the contrary, Deranian and/or S-Tronix could, in fact, access the server.

Submedia offers only speculation, and no evidence, that Roberts' testimony is untruthful or in any way implausible or in conflict with other evidence in the record. Such speculation is insufficient as a matter of law to create a question of fact as to Roberts' credibility. *See Soremekun*, 509 F.3d at 984; *Nelson*, 83 F.3d at 1081-1082; *Witherow*, 52 F.3d at 266. Because, construing the evidence in the light most favorable to Submedia, it was neither clearly erroneous nor manifestly unjust for the court to fail to find a material question as to the credibility of Roberts' undisputed testimony regarding the exclusivity of Submedia's control of the hosting

server, the court's exclusive control findings should not be disturbed.[2]

## II.    Roberts' Motivation for Requesting that the s-tronix.com Website be Made Visible on the Internet

### A.    Relevant Findings

According to the evidence in the record, in or around November 2006 In-Focus began "looking to sell" certain of its assets, including the Technology. Some of the prospective purchasers of the Technology, including defendant Submedia, made inquiries regarding S-Tronix as components of their due diligence investigations. **Because these due diligence inquiries were occurring,** Spencer Roberts, the CEO of plaintiff S-Tronix, requested of an In-Focus corporate officer that In-Focus make the S-Tronix website – which was at that time hosted on a server under In-Focus' exclusive control – visible to the public on the Internet, so that a demonstration version of the Technology accessible through that website could be shown to candidate purchasers.

Opinion and Order, 3-4 (emphasis supplied).

### B.    Discussion

Submedia acknowledges that Roberts testified under oath that his motivation for ensuring that the s-tronix.com website was accessible on the internet was to facilitate In-Focus' efforts to sell the Technology. The record contains no affirmative evidence to the contrary. Nevertheless, Submedia asserts that a finder of fact could reasonably infer the untruthfulness of Roberts' testimony from the timing of Roberts' November 6, 2006, inquiry regarding the website relative to the November 30, 2006, signing of the TPA. Submedia argues that Roberts' testimony is inherently so implausible as to create a material question as to its credibility, in that as of

---

[2] It is worth noting in this context, additionally, that even if Submedia were correct that S-Tronix had enjoyed the ability to access the server that hosted the s-tronix.com website during the effective period of the TPA, in the complete absence of affirmative evidence that S-Tronix ever used the website to develop, market, or produce a product competitive with the Technology, evidence of such ability to access the server would not be sufficient to permit Submedia to successfully oppose S-Tronix' motion for summary judgment.

November 6, 2006, just 24 days before the TPA was signed, it is unlikely that any prospective purchaser other than Submedia was still conducting due diligence as to the value of the Technology, and further unlikely that Submedia itself was continuing to conduct such due diligence inquiries. Submedia notes evidence in the record that Roberts was unable to recall to whom he demonstrated the Wallvue application during this time period. Submedia also notes the presence in the record of evidence that Roberts imperfectly recalled the person or persons at In-Focus/TUN who requested that he demonstrate the application to prospective purchasers. Interpreting this evidence in the light most favorable to Submedia, the court's finding that Roberts was to motivated to ensure that the website was available on the web in order to facilitate In-Focus' sale of the Technology was not clearly erroneous, and therefore should not be disturbed.

Submedia's evidence does not create a material question as to Roberts' credibility. In the complete absence of evidence that Submedia had formally closed its due diligence efforts and that all negotiations with other prospective purchasers of the Technology had ended by November 6, 2006, the timing of Roberts' inquiry regarding the absence of the s-tronix.com website from the internet does not give rise to the reasonable inference that Roberts' testimony was untruthful. It is not particularly implausible to suppose that due diligence efforts might have been ongoing more than three weeks before the asset purchase deal finally closed. In the absence of affirmative evidence casting doubt on Roberts' veracity, a trier of fact could not return a verdict in Submedia's favor based solely on the timing of Roberts' inquiry, and therefore Submedia's speculative theory that Roberts' motivation might have been other than as described in his sworn testimony is insufficient to defeat S-Tronix' motion for summary judgment. *See,*

Page 15 - OPINION AND ORDER

*e.g.*, *Anderson*, 52 F.3d at 815.

Similarly, Roberts' imperfect recall as to the persons to whom he demonstrated the Wallvue application and as to the persons with whom he discussed the need to demonstrate the Technology to prospective purchasers simply does not raise a material question as to the credibility of Roberts' undisputed testimony regarding his motivation for making the inquiry. Moreover, it is not for the court to weigh the credibility of Roberts' testimony, *see, e.g., Lytle*, 494 U.S. at 554-55, but rather to determine whether the record contains *any* evidence in support of Submedia's position, namely that Roberts' motivation in making the inquiry was to market a product competitive with the Technology. Submedia offers only speculation, and no evidence, as to Roberts' alleged ulterior motivation, and therefore has not created a question of material fact sufficient to survive S-Tronix' motion for summary judgment.[3] *See Soremekun*, 509 F.3d at 984; *Nelson*, 83 F.3d at 1081-1082; *Witherow*, 52 F.3d at 266. Because, construing the evidence in the light most favorable to Submedia, it was neither clearly erroneous nor manifestly unjust for the court to find that Roberts' motivation was as described in his undisputed testimony, the court's finding as to Roberts' motivation should not be disturbed.

## III.    Timing of In-Focus' Decision to Sell the Technology

### A.    Relevant Findings

According to the evidence in the record, in or around November 2006 In-Focus began "looking to sell" certain of its assets, including the Technology.

---

[3] Indeed, Submedia's speculation is not merely insufficient to meet Submedia's burden but also highly implausible on its face, in that it requires the court to suppose that Roberts' true intention was to improperly market a competitive product, relying on a website under the control of the very person to whom S-Tronix owed a noncompetition obligation as the sole vehicle for conducting such marketing.

Opinion, 3.

**B.    Discussion**

Submedia argues, correctly, that the record does not contain evidence from which a trier

of fact could reasonably conclude that In-Focus "*began* 'looking to sell'" the Technology in or

around November 2006 (emphasis supplied).  Submedia CEO Peter Corrigan testified that

"InFocus was looking to sell TUN and had shopped it," Corrigan Depo., 30:16-17, but did not

suggest that In-Focus began doing so in or around November 2006.  Roberts testified that, in

November 2006, "InFocus was looking for a number of suitors to purchase TUN," Roberts

Depo., 57:15-21, but does not suggest that the company began doing so at that time.  The court's

finding that In-Focus' decision to sell the Technology *commenced* in November 2006 is

unsupported by evidence in the record, and is therefore erroneous.  The court could have

concluded that In-Focus' efforts to sell the Technology were *ongoing* in and around November

2006, but not that they *began* at that time.

However, Submedia is incorrect when it argues that the court's erroneous conclusion as to

the timing of In-Focus' decision constitutes evidence that Roberts' testimony regarding his

motivation for inquiring as to the status of the s-tronix.com website was untruthful.  As noted

above, the error was the court's and did not involve any misrepresentation by Roberts.

Moreover, the erroneous finding was in no way material to the court's ruling on S-Tronix'

motion for summary judgment.  Because the error is immaterial to the judgment against

Submedia, it provides no basis for modifying the court's judgment of January 21, 2009.

IV.    **The Website *Qua* Marketing Tool**

A.    **Relevant Findings**

Moreover, the website was made available for public access in November 2006, **not for the purpose of marketing the Wallvue technology, but rather for the purpose of assisting potential purchasers of In-Focus' assets** (as distinct from purchasers of S-Tronix' products) in conducting due diligence as to the value of In-Focus' technology and the reliability of its technical support.

Opinion, 6-7 (emphasis supplied).

The record contains affirmative evidence that **during the effective period of the TPA the Wallvue technology was not offered for sale through the S-Tronix website,** including during the period following November 2006 when In-Focus made the website available for public access, that S-Tronix never solicited any person to purchase the Technology or any competing product following the initial sale to In-Focus, and that no prospective purchaser approached S-Tronix regarding products featured on the s-tronix.com site after November 2006.

Opinion, 7 (emphasis supplied).

[T]here is a complete absence of evidence that S-Tronix sought at any material time to market the Technology (or any similar product) to any third party, through the website or otherwise.

Opinion, 7.

B.    **Discussion**

Submedia argues that the court erred in concluding that S-Tronix did not market a competitive product via the S-Tronix website.  In support, Submedia points to one or both of the following exchanges excerpted from Roberts' deposition:

Q.    Now, at some point in time you actually had a website with Wallvue software for sale; is that correct?

A.    Yes, sir.

Q.    And when was that?

A.      Well, it wasn't really for sale, it was up there, it was – we started this first
        agreement with TUN sometime 2003, 2002, 2003.

Roberts Depo., 56:18-25.

Q.      After June 30, 2005, wasn't the Wallvue product available on the Internet
        using the URL http.www.S-Tronix.com [*sic*]?

A.      It was visible on the site.

Roberts Depo., 155:16-19.

According to Submedia's characterization of Roberts' testimony, Roberts first "admitted"
that the product was for sale, and then later "tried to retreat from this testimony."  Submedia
argues that the court failed to resolve the purported conflict in Roberts' testimony in Submedia's
favor as it was required to do when analyzing S-Tronix' dispositive motion.  However, Roberts
never admitted, even momentarily, that Wallvue was offered for sale on the website during the
effective period of the TPA.  In the first of the two exchanges, he may have admitted that that "at
some point in time" Wallvue was offered for sale on the website, but when asked to specify the
time as to which that was true, he indicated a timeframe of 2002 or 2003, before the TPA was
signed, and moreover clarified that while the product was "up there" on the website it was not
there offered for sale.  In the second exchange, when asked whether Wallvue was "available"
during the effective period of the TPA, he unambiguously answered only that Wallvue was
"visible on the site" at that time.  Because Roberts' testimony contained no contradiction, there
was no conflict to resolve in Submedia's favor.

Submedia further argues that the court erred in finding that S-Tronix did not market a
competitive product via the s-tronix.com website during the effective period of the TPA because
it did not expressly consider evidence that language on the website directed visitors to send

questions regarding Wallvue to the email address "support@s-tronix.com." However, because

the record contained evidence, undisputed by other evidence in the record, that the "support@s-

tronix.com" email address forwarded to a location on an In-Focus/Submedia server, *see* Roberts

Depo.. 72:11-21, the court did not err in failing to consider the email address as evidence that the

website was being used to market a competitive product.

Submedia further argues that the court erred because the presence of the website on the

internet, and the fact that the website contained advertising material and quoted prices for at least

some products, necessarily constituted an effort to market the products therein described,

including the Wallvue application. However, as the court noted in its Opinion:

> First, the product that was the subject of the promotional materials on the S-
> Tronix website was not a product competitive with the one sold to Submedia's
> predecessor in interest, but was rather that selfsame product. Essentially, to the
> extent the website can be construed as constituting a marketing effort, the product
> being marketed was Submedia's, not S-Tronix'. Second, and more critically, there
> is a complete absence of evidence that S-Tronix sought at any material time to
> market the Technology (or any similar product) to any third party, through the
> website or otherwise. Third, it was not S-Tronix which made the promotional
> materials available on the internet, but rather Submedia's predecessor in interest,
> and it was not S-Tronix but rather Submedia that thereafter had the authority,
> ability, and incentive to make the materials unavailable again. Under Oregon law,
> S-Tronix cannot be held to have breached its obligations in consequence of
> Submedia's actions, or those of its predecessor in interest. *See Public Market* [*Co.
> v. Portland*], 171 Or. [522,] 588 [(1942)].

Opinion, 7-8. None of the evidence now put forward by Submedia calls the court's prior

conclusions into question. The evidence in the record establishes that it was Submedia's

predecessor in interest rather than S-Tronix that posted the website, along with its advertising

materials, on the internet. Roberts' testimony that S-Tronix did not make any product

competitive with the Technology for sale following the sale to In-Focus is not disputed by any

evidence in the record, and Submedia offers only speculation that his testimony was untruthful. Such speculation is insufficient to create a material question of fact sufficient to permit Submedia to survive S-Tronix' motion for summary judgment.

Because, construing the evidence in the light most favorable to Submedia, it was neither clearly erroneous nor manifestly unjust for the court to find that S-Tronix did not market a product competitive with the Technology on the website during the effective period of the TPA, the court's findings should not be disturbed.

## CONCLUSION

For the foregoing reasons, Submedia's motion (#43) to alter or amend the court's judgment is denied.

Dated this 14th day of April, 2009.

Honorable Paul Papak
United States Magistrate Judge

Page 21 - OPINION AND ORDER